[Crim. No. 16228. Second Dist., Div. Two. Dec. 17, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY KEITH WELBORN, Defendant and Appellant.

716

## Counsel

Patrick J. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ivan Hoffman, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

ROTH, P. J.—Appellant Rodney Keith Welborn was charged with one count of murder (Pen. Code, § 187). He was first tried in 1966. At his first

trial he pleaded not guilty and not guilty by reason of insanity. By stipulation, he was tried by the court, the plea of not guilty was submitted to the court upon the transcript of the preliminary hearing and a conversation between appellant and an investigating officer. He was found guilty of murder of the first degree. The sanity issue was also submitted to the court by stipulation upon the reports of five psychiatrists. None of these reports were offered or considered during the guilt phase of the trial. He was found sane and sentenced to life imprisonment.

On appeal, this court reversed.[1] We held that the failure of defense counsel to present psychiatric testimony or argument during the guilt phase of the trial to establish a defense of diminished capacity "resulted in a total failure to present the cause of the defendant in any fundamental respect, and thereby deprived him of his constitutional right to effective aid of counsel."

Appellant's retrial began on July 29, 1968. His plea of not guilty was tried to a jury. The sole defense was diminished capacity which was presented by the testimony of three psychiatrists who had examined appellant. The jury rendered its verdict of guilty of murder in the first degree on August 20, 1968.

Appellant then waived his right to a trial by jury on his plea of "not guilty by reason of insanity" and submitted that issue to the court. On September 17, 1968, the trial court found appellant sane at the time of the commission of the offense. Appellant was sentenced to prison for the term prescribed by law on October 31, 1968. This appeal followed.

Appellant's primary arguments are: (1) the trial court erred by failing to instruct the jury on "nonstatutory" voluntary manslaughter; and (2) certain items of evidence were erroneously admitted because they were the fruit of admissions made by appellant in the absence of *Miranda* warnings.

Appellant and Richard Rebbe, the victim, left Richard's house in Richard's car at about 1 p.m. on November 20, 1965. They were going hunting in the Los Angeles National Forest and appellant was armed with a pistol and Richard with a rifle. Richard did not return that night.

The next day Richard's mother called appellant and asked him where Richard was. Appellant was evasive but said that Richard had left him at a service station and gone to a party. He also told Mrs. Rebbe that he and Richard had had a slight argument. Mrs. Rebbe then called the police and reported that her son was missing. She told the officers that appellant was the last one she had seen with Richard.

---

[1]*People* v. *Welborn*, 257 Cal.App.2d 513 [65 Cal.Rptr. 8].

On November 22, 1965, Officers Brondell and Long went to appellant's home to investigate. When appellant answered the door, the officers identified themselves, stated they were investigating a missing person's report on Richard Rebbe, and asked appellant if he knew where Richard was. Appellant stepped out on the porch and said, "He's dead." Sargeant Brondell, believing that they might now be investigating a homicide gave appellant his constitutional warnings; that he had the right to an attorney before making any statement and that any statement he made could be used against him. When asked if he understood these rights, appellant said, "Yes. I wanted to turn myself into the police. . . ."

The officers went into the house with appellant while he put on additional clothing. When asked whether he wanted to tell the officers what happened, he made a complete confession. At the suggestion of the officers, appellant then led them to the pistol, which was in appellant's garage, and to the rifle, which he had tossed over a fence into a storage yard. On the following day, because heavy rains prevented the officers and appellant from access to the area on November 22, appellant directed the officers to the place where he had buried Richard's body in the San Canyon area of Los Angeles National Forest. The body was buried eight to nine inches deep. All identification had been removed from the body.

Richard had been shot twice in the head. Either wound would have been immediately fatal. A ballistics expert testified that one of the bullets found in Richard's brain was fired from appellant's pistol and that the other could have been fired from Richard's rifle. Richard's father later found Richard's car in San Diego.

At the retrial, appellant's sole defense was by psychiatric testimony. Each of the psychiatrists called by appellant testified that appellant was in some way mentally incapacitated at the time of the shooting although their testimony differed on the exact nature of the infirmity, appellant's ability to harbor malice, and the material or information by which they reached their conclusions. This testimony was clearly sufficient to entitle appellant to an instruction on "nonstatutory" voluntary homicide. (*People v. Graham,* 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153]; *People v. Castillo,* 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449]; *People v. Conley,* 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911].)

Respondent concedes that it is the duty of the trial judge to properly instruct the jury on all issues in a case whether or not defense counsel

requests a particular instruction (*People* v. *Graham, supra,* at p. 318; *People* v. *Castillo, supra,* at pp. 270-271 [fn. 5].) Nor does respondent question that failure to give a proper instruction is reversible error per se, since such omission deprives defendant of a trial on all of the issues in the case. (*People* v. *Graham, supra,* at pp. 315-316; *People* v. *Castillo, supra,* at p. 270.)

In *People* v. *Aubrey,* 253 Cal.App.2d 912, 919 [61 Cal.Rptr. 772], the court explained the nonstatutory homicide doctrine which was defined by the Supreme Court in *People* v. *Conley, supra:* "What the *Conley* opinion teaches is that there is a type of voluntary manslaughter which does not come within any of the three definitions found in Penal Code section 192. The nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked. It differs from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication."

Respondent argues that the instructions given to the jury, when taken as a whole, adequately instructed the jury on this type of homicide. The instructions on which reliance is placed are those in which the jury was told that: (1) all of the evidence must be considered in determining whether the defendant was suffering from some mental condition which prevented him from forming an essential mental state or specific intent; (2) voluntary manslaughter is the intentional killing of a human being without malice aforethought upon a sudden quarrel or heat of passion without deliberation or premeditation; and (3) that voluntary manslaughter is a homicide. Respondent asserts that, "Since diminished capacity resulting from a mental disease or defect affects the ability to harbor malice and, if there is no malice because of the mental disease or defect, there can be no murder of any degree, then the only offense which can result is voluntary manslaughter. They were in effect so instructed."

There is no meaningful distinction between the instructions given at bench and those given in *Castillo*. Here, as there, the jury was properly instructed on the requirements of first and second degree murder, voluntary manslaughter on a sudden quarrel or heat of passion, and involuntary manslaughter. The *Castillo* opinion focused clearly on the inadequacy of giving only the statutory manslaughter instruction, such as was given in the case at bench. The inadequacy is that it " 'does not reveal to the jury the

existence of the nonstatutory form of the offense. The statutory definition carries the implication that only a homicide provoked by passion or a sudden quarrel can be classified as voluntary manslaughter.' " (*People* v. *Castillo* at p. 269.) An explicit instruction on nonstatutory manslaughter must be given when the defense of diminished capacity has been asserted. (*People* v. *Graham, supra,* at pp. 314-315.) The logical purport of all instructions read together cannot be equated with the clear and simple instruction required (and, indeed, set forth in *People* v. *Conley, supra,* at pp. 324-326, fn. 4).

The failure of the trial court to properly instruct the jury on nonstatutory "diminished capacity" voluntary manslaughter therefore requires reversal.

■ Appellant also claims that the admission into evidence of the pistol, the rifle, and a photograph of the deceased taken when the body was discovered was error because they were each the fruit of admissions made by appellant in the absence of *Miranda* full warnings. Since the issue is likely to arise on retrial we have considered it and we hold the evidence is admissible.

Appellant was warned of his constitutional rights in accordance with *Dorado,* but there was an omission to advise him of his additional right to have appointed counsel as required in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Although the United States Supreme Court has held in *Jenkins* v. *Delaware,* 395 U.S. 213, 214 [23 L.Ed.2d 253, 256, 89 S.Ct. 1677], that the states are not required to apply the *Miranda* standards to retrials of cases originally tried prior to the *Miranda* decision, the California Supreme Court has held that *Miranda* standards must be applied in such retrials. (*People* v. *Doherty,* 67 Cal.2d 9, 20 [59 Cal.Rptr. 857, 429 P.2d 177].)

At appellant's retrial which began in July 1968, the trial court ruled that all of appellant's admissions and confessions to the police officers were inadmissible, with the exception of his completely spontaneous "He's dead." Appellant's counsel then argued that the guns and the picture of the body were also inadmissible as the fruits of the admissions. The trial court received the testimony of the police officers and heard argument out of the presence of the jury. Thereafter it ruled that these items of evidence were admissible as none of them were the result of "exploitation" of appellant's statements.

■ The California Supreme Court, relying on *Wong Sun* v. *United States,* 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407], has emphasized that the purpose of the "fruit of the poisonous tree" doctrine, like that of all

exclusionary rules, is the control of illegal police activity. Speaking of the fruits of unlawful searches, the court said, "To hold otherwise would permit the authorities to profit from their unlawful activity and furnish an incentive for unlawful searches in violation of the Fourth and Fourteenth Amendments in the hope that the direct fruits of the search might be manipulated in such a way as to produce admissible evidence." (*People* v. *Johnson*, 70 Cal.2d 541, 549 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Sesslin*, 68 Cal.2d 418, 427 [67 Cal.Rptr. 409, 439 P.2d 321].)

The court has also noted that one aspect of the test to be applied is how directly the primary illegality has led to the evidence being challenged. (*People* v. *Johnson, supra,* at pp. 548-549.) It is clear that the items in controversy were secured as a direct result of appellant's admissions to the officers. Appellant thus relies on *People* v. *Buchanan,* 63 Cal.2d 880 [48 Cal.Rptr. 733, 409 P.2d 957], in which a gun obtained by the police as a direct result of a defendant's statement obtained in violation of the *Dorado* rule was held to be inadmissible evidence. (*People* v. *Schader,* 71 Cal.2d 761, 778 [80 Cal.Rptr. 1, 457 P.2d 841].) ■ In both *Buchanan* and *Schader,* however, the admissions which led to the blighted fruit were obtained in direct violation of established legal principles; both cases derive from the pre-*Dorado* era, rather than the post-*Dorado* but pre-*Miranda* period in which criminal suspects were given right-to-counsel and other warnings but were not specifically told of their right to state-appointed counsel. (*People* v. *Buchanan, supra,* at p. 887; *People* v. *Schader,* 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665].) These cases are not controlling in a case where, as at bench, the evidence clearly demonstrates that police authorities complied in all respects with the letter and the spirit of the law as it existed at the time of their confrontation with appellant and when the omission to advise of the right to appointed counsel does not present a reasonable risk of affecting the fact-finding process. (*People* v. *Schader, supra,* 71 Cal.2d at p. 778.)

■ As one California court has noted: "The leit motif is whether the admission of the evidence 'would thwart the laudable policies underlying' [citation] the rule upon which the primary illegality is based. . . . There was not police exploitation of a known primary illegality. Their transgressions 'were not intentional evasions of the requirements of the privilege' [citation]. Their only 'fault' was a lack of charismatic prescience that . . . the United States Supreme Court would add to the *Dorado-Escobedo* rules

in *Miranda. . . .*" (*People* v. *Carlin,* 261 Cal.App.2d 30, 38 [67 Cal.Rptr. 557].)

In *People* v. *Johnson, supra,* at p. 549, the court noted, "We do not suggest that evidence should be inadmissible merely because 'but for' the unlawful act the evidence objected to would not have been obtained. Nor do we suggest that the mere occurrence of an unlawful act determines the lawfulness of other evidence related to the unlawful act." As the court emphasized, "We must still determine whether admission of the evidence will frustrate the policy considerations underlying the exclusionary rule. . . ." ▮ At bench appellant, when asked if he understood his rights affirmed that he did and volunteered he was on his way to the police.

To exclude the evidence complained of in the case at bench would "frustrate the policy considerations underlying the exclusionary rule" to a greater degree than its admission. Not only were the officers conscientiously following the requirements of giving a possible homicide defendant his full constitutional warnings, as then required, but there was, in addition, ample evidence, which was heard by the trial court, that appellant wanted to assist the officers, that he was well treated and acting under neither psychological nor physiological pressure, and that the police at no time attempted to "exploit" him. The purposes of the "fruit of the poisonous tree" doctrine would be poorly served by frustrating proper police conduct. (Cf. Hall & Kamisar: Modern Criminal Procedure (2d ed.) p. 330.) The guns and photograph are therefore admissible.

The judgment is reversed.

Herndon, J., and Fleming, J., concurred.